*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

REBECCA LYNN HARRIS,

       Plaintiff-Appellant,

v

BRANDON L. HARRIS,

       Defendant-Appellee.

UNPUBLISHED
December 21, 2023

No. 362552
Oakland Circuit Court
LC No. 2021-504585-DM

Before: PATEL, P.J., and SWARTZLE and HOOD, JJ.

PER CURIAM.

Plaintiff, Rebecca Lynn Harris (Rebecca) appeals as of right the trial court's judgment of divorce, which awarded her and defendant, Brandon Harris (Brandon), joint legal and physical custody of their two minor children, and awarded equal parenting time under a 2-2-5-5 schedule.[1] Rebecca challenges the trial court's custody and parenting-time decisions, and refusal to award interim child support. For the reasons stated in this opinion, we affirm.

## I. BACKGROUND

Rebecca and Brandon met in 2017, while they were both employed at the same company. They married in December 2018. Rebecca gave birth to their daughter, VH, in December 2019. Approximately a year later, in November 2020, Rebecca gave birth to the couples' son, EH, who was born with fused kidneys, a medical condition that requires lifetime medical monitoring. Brandon also has an older son, JH, from a prior marriage and who lives with his ex-wife. In December 2020, Rebecca and the parties' two children left the marital home in Troy and began residing with her mother. Shortly thereafter, Rebecca filed this action for divorce.

---

[1] Under a 2-2-5-5 schedule, a child spends two nights with the first parent and two nights with the other. The child then spends five days with the first parent, and five with the other parent. The schedule provides each parent a long weekend with a child.

VH was approximately two years old at the time of the custody hearing in November 2021. EH was approximately one year old. Brandon remained in the marital home for the duration of the lower court proceedings. For approximately the first three months after the separation, Brandon did not regularly see his children. Pursuant to an April 2021 interim parenting-time order, however, the children were with Brandon every weekend, and with Rebecca during the week. At the time of the custody hearing, therefore, the children had been living with Brandon regularly every weekend for nine months.

In mid-May 2021, Rebecca sought interim child support and an order compelling the sale of the parties' marital home. After Brandon responded, and the court held a hearing, the court entered an order modifying the status-quo order to provide that Brandon was to be solely responsible for payments related to the marital home, and that the parties would pay their own personal expenses. The order also reserved for mediation or trial the issue of temporary child support.

By court order, the parties underwent a psychological evaluation with Richard W. Wooten, Ph.D. After meeting with each party individually several times in June 2021, Dr. Wooten issued an extensive report detailing his findings. Part of his report detailed Rebecca's accusations of domestic abuse. Dr. Wooten also observed the parties with their two children. He addressed the statutory best-interest factors and opined that the children had an established custodial environment with Rebecca. Ultimately, Dr. Wooten recommended that the parties share joint legal and physical custody of the children, and that both parties attend therapy. He also recommended a "2-2-5-5" schedule for parenting time.

A central issue on appeal is Rebecca's failure to timely file her witness list. On July 9, 2021, the deadline for filing witness lists, Brandon timely filed his witness list. On July 14, 2021, after Rebecca had already missed the witness list filing deadline, the parties stipulated to an adjournment of the August 16, 2021 trial date. The parties requested the adjournment because they had not received the psychological evaluation report from Dr. Richard Wooten, who had evaluated both parties, and mediation was scheduled for August 10, 2021. In a stipulated order, the court rescheduled the trial to October 1, 2021. The stipulated order also provided that "[a]ll dates in the court's Domestic Scheduling Order issued on March 17, 2021 will be extended an equivalent number of days to the adjournment of the trial date."

Rebecca filed her witness list on September 13, 2021. Brandon filed a motion to preclude Rebecca from calling any witnesses at trial. He argued that pursuant to the July 14, 2021 stipulated order, the new discovery cutoff date was September 1, 2021. Accordingly, the parties had to file their witness lists by August 25, 2021. Brandon argued that because Rebecca's witness list, filed on September 13, 2021, was untimely, she should be precluded from calling witnesses at trial. He further asserted that he was prejudiced by Rebecca's violation of the scheduling orders. In response, Rebecca attributed the late filing of her witness list to an "administrative error." She also filed a motion for a second adjournment of trial, arguing that if her late filing of her witness list prejudiced Brandon, the solution was to adjourn the scheduled October 1, 2021 trial.

On September 20, 2021, the trial court entered an order granting Brandon's motion to strike Rebecca's witness list but rejected both sides' positions, finding:

[B]oth sides incorrectly state the procedural posture of the case. The [July 14, 2021] adjournment order extended all deadlines "an equivalent number of days to the adjournment of the trial date." This would, for example, move the trial briefing deadline to one week prior to the *new* trial date. The order did not, however, alter *any* deadline tied to the discovery cutoff. Discovery closed two days after the adjournment order [i.e., July 16, 2021]; it was not extended. Because the discovery cutoff in the scheduling order was a discrete date independent of the trial date, it is unclear what an "equivalent number of days to the adjournment of the trial date" would constitute in terms of a deadline.

The court concluded that Rebecca's untimely filing of her witness list warranted discovery sanctions, stating:

Given the untimely filing of [Rebecca's] witness list by several months, and only a few weeks before trial, [Rebecca] may only call herself and [Brandon] as witnesses during her case in chief. [Rebecca] may not call, during her case in chief, any other witnesses on [Brandon's] witness list. [Rebecca] may utilize rebuttal witnesses, if appropriate, but their testimony may only be offered for rebuttal purposes. [Footnotes omitted.]

The day after the court entered its order, Rebecca filed a motion to bar Brandon's witnesses. She argued that because Brandon's list identified witnesses generically, and failed to include their names and addresses, the witnesses should be struck. Rebecca asserted that the vagueness of Brandon's witness list precluded her from conducting any discovery.

The next day, Rebecca filed her exhibit list in which she identified as possible exhibits "text message chains" between her and Brandon. That same day, she filed an amended motion to adjourn the October 1, 2021 trial date.

The trial court entered an order granting Rebecca's request to adjourn trial and rescheduled the matter for November 29, 2021. The court also clarified that "[t]his order adjusts all deadlines in the scheduling order tied to the trial date. Any deadlines in the scheduling order tied to the discovery cutoff date, including the close of discovery, remain unaffected by this order." Regarding Brandon's witness list, the court found that "[w]hile mother's position is well taken, insofar as she cannot reasonably prepare for trial without knowing who may be called during father's case-in-chief, the objection itself is premature." Accordingly, the court found that it would be Brandon's burden to establish an appropriate foundation for any witnesses he intended to call and then, if appropriate, Rebecca could raise any objections, including surprise or lack of notice.

Trial began in November 2021 and lasted two days. At the outset, the court indicated that the only witnesses available to testify if called by either party would be the parties and Dr. Wooten. The court clarified that Brandon could call Dr. Wooten and that Rebecca could cross-examine him. The parties had previously stipulated to the admissibility of Dr. Wooten's extensive report. Thereafter, Rebecca called Brandon as her first witness. Brandon was equivocal on the issue of domestic violence, admitting that Rebecca moved out of the marital home "because of the domestic violence" and admitting to verbal "abuse," but denying specific assaultive acts aside from two instances where he restrained Rebecca in order to leave a room or the house. Rebecca then testified

on her own behalf. Because the parties were unable to complete Rebecca's testimony, the matter was adjourned and scheduled to resume in January 2022.

In mid-January 2022, Rebecca filed an amended exhibit list adding as potential "rebuttal exhibits" several text messages between her and Brandon occurring between January 13, 2021, and February 8, 2021. Brandon moved to strike the amended exhibit list as untimely, noting that under the scheduling order, exhibits were required to be exchanged three weeks before trial. Brandon further noted that all of the proposed additional exhibits could have been included in Rebecca's original exhibit list because the proposed exhibits were text messages from early 2021. The trial court, adopting Brandon's reasoning, granted the motion to strike Rebecca's newly identified exhibits.

When trial resumed in late January 2022, the parties and the court completed their examination of Rebecca. Rebecca's attorney then indicated that he wished to present evidence on rebuttal: recalling the parties and offering additional "rebuttal exhibits." The trial court indicated that Rebecca could be recalled in rebuttal, but it reminded her attorney that it had ruled earlier that no additional exhibits would be admitted. Regarding recalling Brandon, the court noted that Rebecca's attorney had thoroughly cross-examined Brandon in Rebecca's case-in-chief and it would be "silly" to permit him to be recalled as a rebuttal witness. Her attorney argued that he could not be aware of the nature of Brandon's testimony at the outset of trial, including that Brandon would deny any physical abuse. The court rejected this proposed justification and explained that once Brandon testified on direct examination, counsel became aware of Brandon's testimony and then had the opportunity to fully cross-examine him. The court held that Rebecca could not recall Brandon as a rebuttal witness.

After the ruling, Rebecca's attorney again objected and argued that Rebecca should be able to call two therapists in rebuttal. Her attorney represented that Brandon made certain admissions to these therapists. As an offer of proof, Rebecca's attorney stated that, if called, the therapists would testify that Brandon admitted to being "physically violent" and "committing domestic violence against" Rebecca. Brandon's attorney objected, arguing that these witnesses were on Rebecca's untimely witness list, which the court had struck as a discovery sanction. Further, Brandon's attorney objected to the therapists' testimony as privileged, inadmissible, and not true rebuttal witnesses.

Ultimately, the trial court denied Rebecca's request to call the therapists. The court found, among other things, that their testimony would be cumulative. The court noted that Dr. Wooten's report had been admitted and that alleged admissions made by Brandon had been referenced in Dr. Wooten's report. The court then reiterated that testimony could be "reopened" to allow Rebecca to be recalled.

Rebecca then testified about abuse that she claimed Brandon admitted in text messages. She testified that, after they separated, they communicated by text messages. Following a court order, they used a co-parenting application that allows families involved in custody disputes to communicate, share schedules, track expenses, and other related features. Rebecca asserted that Brandon did not testify honestly. According to Rebecca, he lied when he denied any physical abuse and claimed to be an engaged parent. She also testified that in a January 2021 text message, Brandon indicated that she could have full custody of the children. Rebecca stated that Brandon

admitted in writing to things he denied during his testimony, including that he had strangled Rebecca out of frustration. According to Rebecca, Brandon made these admissions in text messages after they separated and she filed for divorce. Both the trial court and Brandon's attorney acknowledged that Rebecca and her attorney had essentially read into the record the content of the excluded exhibits. The court did not, however, strike the testimony. Rather, in response to Rebecca's attorney's request to admit the text messages "that indicate[d] what [she] just testified about," the court stated it would "accept her testimony."

Following the two-day bench trial, the trial court issued a written opinion in which it awarded the parties joint legal and physical custody of the children, and equal parenting time. The court later issued a judgment of divorce consistent with its written opinion. Rebecca now appeals.

## II. PRECLUSION OF EVIDENCE

Rebecca raises two evidentiary issues on appeal. First, she argues that the trial court erred when, as a discovery sanction, it precluded her from calling witnesses other than the parties. Second, she argues that the trial court erred when it precluded her from calling several rebuttal witnesses and from offering into evidence text messages in which Brandon purportedly admitted that he physically assaulted Rebecca. We disagree with both arguments and conclude that the trial court's evidentiary rulings did not constitute an abuse of discretion.

This Court reviews for an abuse of discretion the trial court's decision whether to impose discovery sanctions. *Elahham v Al-Jabban,* 319 Mich App 112, 135; 899 NW2d 768 (2017). Similarly, this Court generally reviews a trial court's decision to exclude evidence for an abuse of discretion. *Elher v Misra,* 499 Mich 11, 21; 878 NW2d 790 (2016). For purposes of an evidentiary ruling, a trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Keinz v Keinz,* 290 Mich App 137, 141; 799 NW2d 576 (2010).

Pursuant to MCR 3.201(C), except for specific exceptions not relevant here, "practice and procedure in domestic relations actions is governed by other applicable provisions of the Michigan Court Rules." MCR 2.401 governs pretrial procedures, including scheduling orders. Under MCR 2.401(B)(2)(a), if the court concludes that a scheduling order would "facilitate the progress of the case," it shall "establish times for events and adopt other provisions the court deems appropriate," including the completion of discovery and the exchanging of witness lists.

Trial courts have the inherent authority to enforce their orders. See, e.g., *Maldonado v Ford Motor Co,* 476 Mich 372, 376; 719 NW2d 809 (2006); *Brenner v Kolk,* 226 Mich App 149, 159-160; 573 NW2d 65 (2002). Separate from the trial court's inherent authority, under the court rules, the trial court has explicit authority to enforce its discovery and scheduling orders. Under MCR 2.401(I)(2), if a party does not provide a witness list within the time directed by the court, "the court may order that any witness not listed in accordance with this rule will be prohibited from testifying at trial except upon good cause shown." Similarly, under MCR 2.313(B)(2)(b), a court may sanction a party who fails to comply with discovery orders by preventing that party from "support[ing] or oppos[ing] designated claims or defenses, or prohibiting the party from introducing designated matters into evidence[.]" See MCR 2.313(B).

In *Duray Dev, LLC v Perrin*, 288 Mich App 143, 165-166; 792 NW2d 749 (2010), this Court addressed the imposition of sanctions when a party fails to file a witness list in accordance with a scheduling order. This Court specifically acknowledged that sanctions may include precluding a party from calling witnesses. This Court stated:

> Once a party has failed to file a witness list in accordance with the scheduling order, it is within the trial court's discretion to impose sanctions against that party. These sanctions may preclude the party from calling witnesses. Disallowing a party to call witnesses can be a severe punishment, equivalent to a dismissal. But that proposition does not mean that disallowing witnesses is always tantamount to a dismissal. Nor does it mean that a trial court cannot impose such a sanction even if it is equivalent to a dismissal. Because the decision is within the trial court's discretion, caselaw mandates that the trial court consider the circumstances of each case to determine if such a drastic sanction is appropriate. The record should reflect that the trial court gave careful consideration to the factors involved and considered all of its options in determining what sanction was just and proper in the context of the case before it. [*Duray Dev, LLC*, 288 Mich App at 164-165.]

This Court also provided a nonexhaustive list of relevant factors to consider when determining the appropriate discovery sanction:

> (1) whether the violation was wilful [sic] or accidental; (2) the party's history of refusing to comply with discovery requests (or refusal to disclose witnesses); (3) the prejudice to the defendant; (4) actual notice to the defendant of the witness and the length of time prior to trial that the defendant received such actual notice; (5) whether there exists a history of plaintiff[] engaging in deliberate delay; (6) the degree of compliance by the plaintiff with other provisions of the court's order; (7) an attempt by the plaintiff to timely cure the defect[;] and (8) whether a lesser sanction would better serve the interests of justice. This list should not be considered exhaustive. [*Id*. at 165.]

"The trial court should also determine whether the party can prove the elements of his position based sole on the parties' testimony and any other documentary evidence." *Id*. (quotation marks and citation omitted).

Here, the trial court entered a scheduling order on March 17, 2021, providing, among other things, that the parties complete discovery by July 16, 2021, and setting trial for August 16, 2021. The scheduling order required the parties to file witness lists at least one week before the close of discovery, and to exchange exhibits at least three weeks before trial. The scheduling order also required the parties to submit physical copies of all proposed exhibits to the court at least one week before trial. The order stated that noncompliance with any of its terms could result in dismissal, a default judgment, refusal to permit witness testimony or admit exhibits, or other sanctions, including an assessment of costs.

The trial court did not abuse its discretion when it struck Rebecca's witness list as a discovery sanction. The parties do not dispute that Rebecca violated the scheduling order. The parties' witness lists were due July 9, 2021, pursuant to the court's March 17, 2021 scheduling order. There is no dispute that Rebecca did not meet this deadline and did not file a motion to extend the deadline. As a result, Rebecca violated the trial court's scheduling order.

To the extent Rebecca claims she missed the deadline due to confusion about the July 14, 2021 stipulated order (stating that "[a]ll dates in the court's Domestic Scheduling Order issued on March 17, 2021, will be extended an equivalent number of days to the adjournment of the trial date"), her argument fails for two reasons. First, the July 14, 2021 stipulated order was entered after Rebecca violated the scheduling order (i.e., her witness list was due July 9, 2021). Second, even accepting Brandon's interpretation of the July 14, 2021 order, that it created a new witness list filing deadline (August 25, 2021), Rebecca also missed this deadline because she did not file the witness list until September 13, 2021. Under the two scenarios, Rebecca's witness list was either 66 days late or 19 days late.

Once she failed to file her witness list in accordance with the scheduling order, the trial court had discretion to impose sanctions. *Duray Dev, LLC*, 288 Mich App at 164. See also MCR 2.313(B)(2)(b); MCR 2.401(I)(2). Further, except upon good cause shown, a trial court may order that any witness not listed in accordance with the scheduling order be prohibited from testifying. MCR 2.401(I)(2). An unexplained "administrative error" did not constitute good cause, since attorney's negligence is ordinarily imputed to the client. *Amco Builders & Developers, Inc v Tam Ace Joint Venture,* 469 Mich 90, 96; 666 NW2d 623 (2003). The trial court, therefore, did not abuse its discretion when it concluded that Rebecca failed to establish good cause to preclude the imposition of the discovery sanction.

Rebecca also violated the scheduling order when in mid-January 2022, she filed an amended exhibit list midtrial. The scheduling order specifically provided that the parties had to file their exhibit lists three weeks before trial and actual exhibits one week before trial. The additional text messages identified in the amended witness list were approximately a year old, so Rebecca's failure to include the exhibits in her original witness lists appears to be nonaccidental. Further, it evidences a pattern noncompliance with the court's scheduling orders. Accordingly, the trial court did not abuse its discretion when it struck the amended exhibit list that included the several additional text messages.

Rebecca also argues that the trial court abused its discretion when it precluded her from calling therapists, including Dr. Wooten, as rebuttal witnesses or offering the previously excluded text messages. The trial court did not abuse its discretion by precluding the proffered rebuttal testimony. The court denied Rebecca's request because it found that the proffered rebuttal evidence was cumulative and because it appeared that she was attempting to circumvent its earlier orders excluding the evidence. Further, the court admitted through stipulation the report of Dr. Wooten, one of the excluded therapists. In that report, Dr. Wooten specifically referenced the existence of text messages he had seen in which Brandon admitted to physically assaulting Rebecca. Rebecca also stipulated that, if called, Wooten would have testified consistent with his report. Under these circumstances, the trial court's decision to exclude the proposed rebuttal evidence was within the range of principled outcomes.

Regardless, any error in excluding the evidence was harmless. See MCR 2.613(A) ("An error in the admission or exclusion of evidence . . . is not ground for granting a new trial, for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice."). Rebecca was not completely denied the opportunity to present rebuttal evidence. In addition to Dr. Wooten's report, Rebecca's direct testimony, and her cross-examination of Brandon, the court allowed Rebecca to retake the stand to testify in rebuttal. At that time, Rebecca testified that Brandon lied during his testimony and had admitted in writing that he was willing to grant full custody to her, and that he strangled her out of frustration. During this testimony, Rebecca was essentially permitted to read into the record the content of the excluded exhibits. The trial court seems to have found Rebecca's claims of domestic violence at least somewhat credible. It agreed with Dr. Wooten's findings that there was evidence that both parties engaged in questionable conduct. By implication, it must have found her allegations of domestic abuse credible. For all practical purposes, Rebecca achieved her goal. Despite her representations to the contrary, Rebecca was able to rebut Brandon's testimony that he did not physically assault her. Any error in the exclusion of the proposed rebuttal evidence was, therefore, harmless.

For these reasons, the trial court's sanction was not an abuse of discretion.

### III. ESTABLISHED CUSTODIAL ENVIRONMENT

Rebecca argues that the trial court erred by finding that there existed an established custodial environment with both parties. We disagree.

MCL 722.28 provides that when reviewing a lower court order in a custody dispute, "all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." We therefore review the trial court's finding under the great-weight-of-the-evidence standard. *Pennington,* 329 Mich App at 570.

In Michigan, child custody is governed by the Child Custody Act, MCL 722.21 *et seq.* "When resolving important decisions that affect the welfare of the child, the court must first consider whether the proposed change would modify the established custodial environment." *Pierron v Pierron,* 486 Mich 81, 85; 782 NW2d 480 (2010). A court's decision regarding the existence of an established custodial environment is critical because this finding then determines the burden of proof imposed on a party seeking to change custody. See, e.g., *Pierron*, 486 Mich at 93; *Shade v Wright*, 291 Mich App 17, 23; 805 NW2d 1 (2010).

MCL 722.27(1)(c) instructs that

> [t]he custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered.

An established custodial environment can exist with either the plaintiff or the defendant, or with both parties. *Kessler v Kessler,* 295 Mich App 54, 62; 811 NW2d 39 (2011).

The trial court correctly concluded that a custodial environment existed with both parents. Both parties testified that while the children were in their individual homes, the parties engaged in activities with the children and provided for their care. Rebecca read to the children and included them in her daily routine. Similarly, Brandon fed, bathed, and dressed the children while they were in his care. Brandon and the children went for walks to the park, and they regularly played together. When Brandon's older son visited, the children also played with their older half-sibling. Brandon also put the children down for naps as part of their regular daily schedule. When it was time for the children to return to Rebecca's home on Sunday evenings, Brandon prepared VH's hair, which typically meant ensuring that it was clean and putting it in "ponies." There was also testimony that both parents fostered relationships with the extended maternal and paternal families.

Dr. Wooten, the court-appointed evaluating psychologist, had an opportunity to observe both parties interact individually with the children. He found that a bond existed between Rebecca and the children. Rebecca engaged VH and EH, and all three appeared to enjoy their time together. Dr. Wooten noted nothing of concern that might suggest that Rebecca had difficulties parenting the children. He opined that Rebecca had a healthy attachment with her children. Regarding Brandon, Dr. Wooten noted that VH roamed around his office and interacted with Brandon. It was evident that the children were comfortable with Brandon because they never seemed ill-at-ease. EH sat in Brandon's lap and the children interacted with each other as well. Dr. Wooten concluded that a bond existed between Brandon and the children, opining that Brandon and the children appeared to take great pleasure in their time together. He also concluded that the attachment between Brandon and the children was intact. Finally, Dr. Wooten never observed anything that caused concerns about Brandon's ability to "work with and/or deal directly with his son or daughter."

This evidence showed that when the children were in each party's individual care, they looked to that parent for the necessities of life, parental comfort, and guidance. That evidence included both parents' testimony and Dr. Wooten's conclusions. Accordingly, the trial court's finding that the established custodial environment existed with both parties is not against the great weight of the evidence.

Rebecca asserts that the trial court's conclusion conflicts with Dr. Wooten's conclusion that the children had an established custodial environment only with her. We disagree for two reasons. First, Dr. Wooten reached this conclusion "due to time together, the continuity of care by the maternal grandmother, as well as avoidance of exposure to potentially abusive interactions between the parents (not against either child)." He appears to have relied heavily on the fact that the children spent more time with Rebecca because of the mandates of the interim parenting-time order. The more relevant inquiry, however, is who the children naturally looked to—while in a particular environment—for guidance, discipline, the necessities of life, and parental comfort. MCL 722.27(1)(c). Second, the court was not bound by Dr. Wooten's opinion and it was up to the court to determine the weight to give that opinion. The court was free to discount or partially accept Dr. Wooten's opinion because it was unclear whether he knew that Brandon had only minimal time with EH, and because it had only been three months since Brandon regained parenting time with his children.

Rebecca also asserts that the trial court erroneously found that she deprived Brandon of parenting time for three months, and then focused on this erroneous finding to reject Dr. Wooten's

opinion and instead find that an established custodial environment existed with both parents. Although Rebecca denied that she kept the children from Brandon and refused to facilitate parenting time for several months, there was evidence to the contrary that the trial court found credible. Specifically, Brandon testified that he consistently requested to see his children between January 2021 and April 2021, but Rebecca refused his requests. The court did not use this finding regarding Rebecca's actions to assess the relationship of the parties to their children. Instead, it appropriately focused on the testimony of Rebecca and Brandon regarding their engagement with their children. We acknowledge that the court referenced its finding that Rebecca deprived Brandon of parenting time. But it only did so in the context of questioning whether Dr. Wooten accounted for the fact that at the time of the evaluation, Brandon had only been visiting regularly with the children for approximately three months. The court then explained that, unlike Dr. Wooten, it had the benefit of several more months of operating under the existing parenting-time schedule. It was not so much that Rebecca had interfered with Brandon's parenting time, but rather, the consequence of that interference, i.e., Brandon's limited time with the children, that the court considered.

In sum, the trial court's finding that an established custodial environment existed with both parties is not against the great weight of the evidence.

## IV. CHILDREN'S BEST INTERESTS

Next, Rebecca argues that the trial court erred in its findings regarding the children's best interests and by awarding the parties joint legal and physical custody of the children. We disagree.

The trial court's factual findings regarding the statutory best-interest factors are also reviewed under the great-weight-of-the-evidence standard. *Dailey v Kloenhamer*, 291 Mich App 660, 664; 811 NW2d 501 (2011). The trial court's ultimate decision regarding custody is reviewed for an abuse of discretion. *Id.* "Child support orders and the modifications of such orders are [also] reviewed for an abuse of discretion." *Peterson v Peterson,* 272 Mich App 511, 515; 727 NW2d 393 (2006). An abuse of discretion, for purposes of a child custody determination, exists when the result is so palpable and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias. *Merecki v Merecki,* 336 Mich App 639, 644; 971 NW2d 659 (2021); *Dailey*, 291 Mich App at 664-665.

Reviewing a court's custody decision starts with considering the trial court's authority under MCL 722.27. In relevant part, MCL 722.27(1)(c) provides that "[t]he court shall not modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." As noted, the trial court properly concluded that an established custodial environment existed with both parties. The court then found that because Rebecca's request for sole legal custody would alter the children's established custodial environment, she was required to show by clear and convincing evidence that the proposed change in custody was in the children's best interests. To the extent that Rebecca suggests that she was only required to establish her position by a preponderance of the evidence, she is mistaken. "If a child has an established custodial environment with both parents neither parent's custody may be disrupted

absent clear and convincing evidence that the change is in the child's best interest." *Bofysil v Bofysil,* 332 Mich App 232, 243; 956 NW2d 544 (2020).[2]

Custody disputes are to be determined on the basis of the best interests of the child, as measured by the 12 factors set forth in MCL 722.23. Generally, the trial court must explicitly state its findings and conclusions regarding each factor. *Riemer v Johnson*, 311 Mich App 632, 641; 876 NW2d 279 (2015). The court is not, however, required to comment on every piece of evidence entered and every argument raised. *MacIntyre v MacIntyre (On Remand),* 267 Mich App 449, 452; 705 NW2d 144 (2005). "A court need not give equal weight to all the factors, but may consider the relative weight of the factors as appropriate to the circumstances." *Sinicropi v Mazurek,* 273 Mich App 149, 184; 729 NW2d 256 (2006). The trial court found that Factors (a), (b), (c), and (h) favored both parties. It found that Factors (d), (e), (f), (g), (j), and (k) favored neither party. Rebecca challenges several, but not all, of the court's findings.

## 1. FACTOR (B)

Rebecca first argues that the trial court should have found that factor (b), the "capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the children or child in his or her religion or creed, if any," MCL 722.23(b), favored her alone. Instead, the court found that this factor favored both parties. The court explained that both parties expressed a willingness to teach the children about religion, but let each child chart their own spiritual path. The court also found that although Rebecca opined that Brandon's parenting style lacked sufficient structure, she did not assert that he would harm the children or otherwise act contrary to their needs.

On appeal, Rebecca argues that the court made no specific factual finding under this factor and therefore this Court cannot conduct a review. Although the court's analysis of this factor was streamlined, it did make factual findings. Rebecca further argues that she was the parent who exhibited the capacity to give the children parental guidance, who has cared for them since birth, and who has arranged and attended the children's medical appointments. But there was also testimony that both parties were bonded to the children, gave them love and affection, and both actively participated in activities with them. The trial court's decision to weigh this factor equally in favor of both parties was not against the great weight of the evidence.

## 2. FACTOR (C)

---

[2] Rebecca argues that the trial court was required to address whether proper cause or a change of circumstances existed before modifying or amending the April 7, 2021 consent order regarding interim parenting time. She is mistaken. The interim order was a temporary order that was entered without an evidentiary hearing or specific findings. The custody order that Rebecca now challenges on appeal was the first and only custody order issued on the basis of evidence presented at an evidentiary hearing and an evaluation of the best-interest factors set forth in MCL 722.23. Accordingly, the court did not have to find a change of circumstance or proper cause. *Butler v Simmons-Butler,* 308 Mich App 195, 202 n 2; 863 NW2d 677 (2014.)

Factor (c) involves the capacity of the parties to provide the children with food, clothing, medical care, and other material needs. See MCL 722.23(c). The trial court found that both parties were capable and disposed to provide the children with their basic needs. The court noted that neither party asserted that the other parent's care of the children was inappropriate. But Rebecca now argues that she expressed concerns about Brandon's parenting skills. Rebecca also argues that she consistently provided food, clothing, medical care, and the children's material needs. She asserts that the trial court's findings were vague, insufficient, and inaccurate, and that its conclusion that this factor favored both parties was not supported by the great weight of the evidence. We disagree.

The testimony established that both parties provided for the children's needs. Brandon maintained a stable home for the children and his testimony describing the routine of a typical weekend demonstrated that he was meeting all of the children's physical and emotional needs. Rebecca acknowledged at trial that she was not aware of what transpired in Brandon's home during parenting time, and it was possible that he had instituted a routine for the children. Ultimately, the court's finding that this factor favored both parties is not against the great weight of the evidence.

### 3. FACTOR (D)

Rebecca also argues that the trial court erred when it determined that factor (d), the "length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity," MCL 722.23(d), favored neither party. The court noted that VH lived with both parents for a year before the separation. Because the parties separated shortly after EH's birth, that child lived with both of the parties for a significantly shorter period. The court noted that Rebecca's lease expired in March 2022 and her housing situation was unknown. The court also considered that the marital home, where Brandon resided, was to be sold under the judgment of divorce. Given that neither party's then-current housing situation was particularly stable, the court found that this factor did not favor either party.

Rebecca argues that it was wrong for the trial court to find that the children did not have a stable environment at the time. She asserts that the children had, and continue to have, a stable and continuous environment with her. There was, however, similar credible testimony that during the same period, Brandon maintained stability and continuity in the marital home for the children's benefit. When the court issued its custody decision, however, both parties' future housing was uncertain. For this reason, the court concluded that this factor did not favor either party. This finding was not against the great weight of the evidence.

### 4. FACTOR (E)

Factor (e) directs the court to consider "[t]he permanence, as a family unit, of the existing or proposed custodial home or home." MCL 722.23(e). The trial court found this factor favored neither party, adopting its analysis of factor (d). Rebecca argues that the court's analysis is insufficient and against the great weighed of the evidence. She notes, however, that Dr. Wooten reached essentially the same conclusion as the trial court. Regarding this factor, Dr. Wooten equivocated: "This factor favors the plaintiff for the existing custodial setting, but favors both parties for the proposed custodial environment, provided the contingencies are met, and the potential domestic abuse is diminished." Rebecca contends that Dr. Wooten's analysis of this

factor emphasized the importance of the domestic-abuse issue. Rebecca's argument, however, focuses on "acceptability" rather than a "permanence" analysis. In *Fletcher v Fletcher,* 447 Mich 871; 526 NW2d 889 (1994), our Supreme Court held that it was legal error for the trial court to consider the "acceptability of the custodial home" when evaluating Factor (e). Considering that the proper inquiry is the permanence of the existing or proposed home, the trial court's findings are not against the great weight of the evidence.

## 5. FACTOR (F)

Next, Rebecca challenges the trial court's finding regarding factor (f), which concerns the moral fitness of the parties. See MCL 722.23(f). The trial court concluded that this factor did not favor either party. The court noted that although Rebecca argued that Brandon drank too much and committed acts of domestic violence, there were serious questions regarding the judgment of both parties. The court relied, in part, on Dr. Wooten's opinions that domestic violence was a serious aspect of the case, and that it could never be known for certain exactly what happened, but "one certainty is that both parties played a role in how things escalated." Dr. Wooten then alluded to both Rebecca's behavior toward her stepson and her allegations about Brandon's physical abuse. Dr. Wooten noted that the "one certainty" in this case was that "both parties played a role in how things escalated," whether that involved the "treatment of a child" or "domestically questionable behaviors." Dr. Wooten concluded, as did the trial court, that this factor favored neither party.

Rebecca again argues that the trial court's and Dr. Wooten's analysis emphasized the importance of having a sufficient record concerning domestic violence, and argues that the court abused its discretion by denying her the opportunity to present her full case. But this argument ignores the reality of the record. The parties explored the alleged domestic violence during the evidentiary hearing. Rebecca testified extensively about the alleged domestic assaults, Dr. Wooten's report was admitted by stipulation, and Rebecca testified in rebuttal about the abuse. The record also included evidence that Rebecca was sometimes the aggressor, that Brandon had to physically restrain Rebecca to get away from her, that Rebecca treated JH poorly, and that Rebecca had a contentious relationship with Brandon's ex-wife. On balance, the record supports a finding that neither party was in a position to assume the moral high-ground. Accordingly, the trial court's finding that this factor did not favor either party is supported by the great weight of the evidence.

## 6. FACTOR (G)

Factor (g) concerns the mental and physical health of the parties. See MCL 722.23(g). The trial court found that this factor favored neither party. Incorporating by reference a portion of its property-division analysis, the court noted the testimony by both parties that they were in good physical health. The court also noted that both parties denied mental-health issues and that they both participated in regular counseling. Additionally, the court noted Dr. Wooten's opinion that "neither [party] seems to be willing to accept blame for their role in the issues under consideration in this report." Rebecca argues that the trial court's findings are insufficient for adequate review, but we disagree. The court clearly found that Rebecca and Brandon each had unresolved emotional issues. This finding is supported by the record. Accordingly, the trial court's finding that this factor favored neither party is not against the great weight of the evidence.

## 7. FACTOR (J)

Rebecca next argues that the trial court erred by finding that factor (j), which concerns the "willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents," MCL 722.23(j), did not favor either party. We disagree. The court found that both parties appeared willing to support the children's relationship with the other parent. It did, however, have reservations about the extent to which the parties might use the children to control, constrain, or manipulate the other's party's behavior in the future.

Rebecca argues that the trial court did not consider the entire factor. She notes that the factor was amended in 2016 to add that "a court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent." See MCL 722.23(j). She adds that the issue of domestic abuse is directly relevant to this second clause of the factor. Rebecca fails to explain, however, how her allegations of abuse are related to the second clause of Factor (j). Affording the language its plain meaning, the clause is a constraint on a trial court's inquiry. In this regard, there is no evidence that the court violated the constraining language in Factor (j). There was sufficient evidence for the trial court to find that this factor was neutral because both parties testified that they loved their children and would do what was best for their children. The trial court's finding regarding this factor is, therefore, not against the great weight of the evidence.

## 8. FACTOR (K)

Finally, Rebecca argues that factor (k), "[d]omestic violence, regardless of whether the violence was directed against or witnessed by the child," MCL 722.23(k), should have favored her instead of being found neutral. When addressing this factor, the court acknowledged Rebecca's position that this factor "tips the analysis overwhelmingly to her favor." The court cited Rebecca's admitted exhibit, a text message, in which Brandon stated that he did a lot of bad things that he should not have done. The court also noted that "while domestic violence is unacceptable in any context, it is also a reality that the parties have lived apart since December 2020 and apparently they have not been alone with each other since prior to that time based on [Rebecca's] implementation of a safety plan at the marital home during the final months of her residency." The court noted its concurrence with Dr. Wooten that it may never be known, except by the parties, "who did what." The court also acknowledged that Dr. Wooten reviewed materials that it was unable to review because of the evidentiary issues in the case. Ultimately, the court concluded that because of the insufficient evidence on this point, this factor favored neither party.

Rebecca argues that the trial court had the authority to remedy the evidentiary deficiency by allowing additional and rebuttal testimony, as well as entering the text messages and other rebuttal material into evidence. As indicated earlier, however, the trial court did not abuse its discretion when it imposed discovery sanctions that precluded the admission of certain evidence. The trial court's factual findings are to be reviewed under the great-weight-of-the-evidence standard. The trial court found that this factor did not favor either party. When considering the conflicting testimony that was available for the court's review and the fact that there were no allegations of domestic abuse occurring since December 2020, its finding that this factor was neutral was not against the great weight of the evidence.

## 9. AWARD OF JOINT LEGAL AND PHYSICAL CUSTODY

After discussing the statutory best-interest factors, Rebecca asserts that she prevails on all factors and that Brandon has prevailed on none. For the reasons explained earlier, Rebecca's arguments are unpersuasive. The trial court ultimately concluded that after weighing the best-interest factors, Rebecca did not show by clear and convincing evidence that awarding her sole legal and physical custody was in the children's best interests. Although Rebecca disagrees, we are required to affirm the trial court's custody decision "unless the decision is palpably and grossly violative of fact and logic." *Merecki,* 336 Mich App at 644; MCL 722.28. Considering the testimony and evidence presented at trial, the court's decision is supported by fact and logic. Accordingly, the court did not abuse its discretion by awarding joint legal and physical custody to the parties.

## V. PARENTING TIME

Next, Rebecca contends that the trial court abused its discretion by adopting the "2-2-5-5" parenting-time schedule proposed by Brandon. Before trial, pursuant to the April 7, 2021 interim order, the children were essentially with Rebecca during the week, and with Brandon every weekend. The trial court's parenting-time award resulted in the children spending equal time with Rebecca and Brandon. We review the trial court's parenting time decision for abuse of discretion. See *Shade,* 291 Mich App at 32. After reviewing the record, we conclude that the trial court's parenting-time award was not an abuse of discretion.

Parenting time is governed by MCL 722.27a, which provides:

> Parenting time shall be granted in accordance with the best interests of the child. It is presumed to be in the best interests of a child for the child to have a strong relationship with both of his or her parents. Except as otherwise provided in this section, parenting time shall be granted to a parent in a frequency, duration, and type reasonably calculated to promote a strong relationship between the child and the parent granted parenting time.

MCL 722.27a(7) provides that the court may consider the following factors when determining the frequency, duration, and type of parenting time to be awarded:

> (a) The existence of any special circumstances or needs of the child.

> (b) Whether the child is a nursing child less than 6 months of age, or less than 1 year of age if the child receives substantial nutrition through nursing.

> (c) The reasonable likelihood of abuse or neglect of the child during parenting time.

> (d) The reasonable likelihood of abuse of a parent resulting from the exercise of parenting time.

> (e) The inconvenience to, and burdensome impact or effect on, the child of traveling for purposes of parenting time.

(f) Whether a parent can reasonably be expected to exercise parenting time in accordance with the court order.

(g) Whether a parent has frequently failed to exercise reasonable parenting time.

(h) The threatened or actual detention of the child with the intent to retain or conceal the child from the other parent or from a third person who has legal custody. A custodial parent's temporary residence with the child in a domestic violence shelter shall not be construed as evidence of the custodial parent's intent to retain or conceal the child from the other parent.

(i) Any other relevant factors.

The trial court must consider the best interests of the children even if it does not explicitly address the statutory factors. *Shade,* 291 Mich App at 31-32. If a proposed change in parenting time would result in the modification of a child's established custodial environment, the burden is on the party proposing the change to establish by clear and convincing evidence that the change is in the child's best interests. *Pierron,* 486 Mich at 92. By contrast, if the proposed change would not modify a child's established custodial environment, a party need only show by a preponderance of the evidence that the change is in the child's best interests. *Id*. at 93.

Both parties requested a significant change in parenting time from that provided in the interim parenting-time order. Rebecca proposed that Brandon's parenting time be reduced significantly, from every weekend, to every other weekend. By his "2-2-5-5" proposal, Brandon wished to increase visits significantly. The proposed changes would result in either subtracting 52 nights or adding 78 nights to Brandon's parenting time each year. The trial court properly found that because both parties' proposals would effectively modify the children's established custodial environment, Rebecca and Brandon both had to show, by clear and convincing evidence, that their respective proposal was in the children's best interests. See *Pierron,* 486 Mich at 92.

In assessing the factors, the trial court noted that EH had a medical condition that had to be monitored his entire lifetime. The court found that EH's care had been well managed by both parents. Thus, the court found that Factor (a) favored both parties. Regarding factor (c), the risk of abuse or neglect during parenting time, the court noted that Rebecca had testified that while she was concerned that Brandon might employ the "silent treatment" with the children, she had no concerns that he would physically abuse VH or EH. Accordingly, the court found that factor (c) favored both Rebecca and Brandon. Regarding factor (d), which assessed the likelihood of abuse by a parent, the court found this factor to be neutral. It noted Rebecca's testimony that she had taken steps to minimize, even eliminate, contact with Brandon. Further, the court's orders included a requirement that the parties exchange the children at a police station. Factor (e) assessed the burdens placed on a child traveling for purposes of parenting time. The court found that because the testimony established that the children's travel was minimal, factor (e) favored both parties. Factors (f) and (g) required the court to consider whether a parent had failed to attend parenting time or if they would likely fail to attend in the future. The court noted that these factors favored both parties because there was no evidence that the parties had failed to comply with the court's interim parenting-time order. Finally, factor (h) assessed the likelihood that a parent might retain

-16-

or conceal the child from the other parent. Noting the parties' compliance with the court's interim orders, the court found that this factor favored both parents.

Rebecca does not specifically address, in detail, the factors set forth in MCL 722.27a(7). Instead, she cites Dr. Wooten's report in which he recommended that the parenting time remain the same, except for granting Brandon an additional three hours of parenting time on a weekday. Rebecca further contends that the trial court ignored Dr. Wooten's recommendation that Brandon's parenting time should only be expanded after he made progress through participation in therapy. But at the time the trial court issued its decision, Brandon had been in therapy for eight months. The trial court's order also put multiple safeguards in place. The court ordered the parties to attend a co-parenting coaching program. Brandon was ordered to attend a program for fathers with young children and complete a batterer's intervention course. And both parties were ordered to continue their individual therapy.

Regarding the parenting-time factors listed in MCL 722.27a(7), the trial court concluded that factors (a), (c), (e), (f), and (g) favored both parents. The court found that the other factors were either neutral or inapplicable. The court then concluded that Rebecca had not established by clear and convincing evidence that it was in the children's best interests to curtail Brandon's parenting time. Conversely, the court found that Brandon had demonstrated by clear and convincing evidence that a "2-2-5-5" schedule would be in the children's best interests. There was testimony to support the trial court's rulings. Accordingly, the court did not make factual findings against the great weight of the evidence, and the court's acceptance of Brandon's proposed parenting-time schedule did not amount to a palpable abuse of discretion. See *Shade,* 291 Mich App 32.

## VI. INTERIM CHILD SUPPORT

Finally, Rebecca challenges the award of child support from the entry of judgment forward, arguing that she was entitled to interim child support from the filing of the complaint until resolution of the case. We disagree.

In a May 28, 2021 order, the court ordered that the matter of interim child support would be reserved for trial. The order also included the following directive:

> Both parties may utilize their individual accounts and maintain all records for their income and expenses retroactive to January 8, 2021. For final resolution or adjudication, both parties shall provide an accounting as to all income received and all expenses paid so that a determination can be made as to "who owes whom what" for the months of January 2021 through the date of resolution.

In anticipation of trial, Rebecca briefly referenced interim child support in the final paragraph of her trial brief. With little elaboration, she suggested that the marital home be sold, that the proceeds be divided equitably, and that Brandon use his lump sum to pay her retroactive temporary child support. In her opening statement, however, Rebecca did not request that the court consider or award interim child support. The only reference to child support, interim or otherwise, made during Rebecca's opening statement was simply that "child support should be based on the Michigan formula." See *Stallworth v Stallworth*, 275 Mich App 282, 284-285; 738

NW2d 264 (2007) (describing the steps for determining a child support award and indicating that courts must comply with the Michigan Child Support Formula Manual when determining the appropriate award amount).

At the conclusion of Rebecca's testimony, the parties rested. The trial court then requested that the parties submit their closing arguments in writing. It also identified the issues in dispute as including custody, parenting time, child support, and disposition of the home, bank accounts, and retirement accounts. The court emphasized that the parties must identify with specificity the relief requested. In her written closing argument and closing rebuttal argument, Rebecca made no reference to or request for any retroactive, temporary child support. In the judgment of divorce, commencing upon entry of the judgment, Rebecca was ordered to pay child support to Brandon in the amount of $269 a month.

During trial, it was undisputed that Brandon did not pay any child support to Rebecca. Brandon testified that Rebecca never asked him for any support. Rebecca seems to suggest that because she paid the mortgage on the marital home until June 2021, and also paid for her own housing, she paid more than her share of the children's expenses. But a joint checking account was established that the parties were permitted to use for their marital and childcare expenses. Rebecca ignores that, until June 2021, she was also permitted to use the joint checking account for her child-related expenses, including housing.

Not only did Rebecca fail to request interim child support in her written closing argument, she also failed to present any evidence at trial supporting her claim for interim support, other than the amount of her salary. The court noted this when it found that "[b]ecause each party cared for the children's needs during their parenting time, and neither side demonstrated cause for an award of retroactive support, child support shall start the first day of the calendar month following this order." Considering the foregoing, the trial court did not abuse its discretion when it declined to award interim child support to Rebecca.

We affirm.[3]

/s/ Sima G. Patel
/s/ Brock A. Swartzle
/s/ Noah P. Hood

---

[3] Having rejected Rebecca's claims of error, and thus finding no basis to remand to the trial court, we need not consider her argument that the case should be reassigned on remand. Regardless, there is no indication in the record that the trial judge acted inappropriately or was biased against Rebecca, or that reassignment is necessary to preserve the appearance of justice. MCR 2.003(C)(1)(a); *Bayati v Bayati*, 264 Mich App 595, 602-603; 691 NW2d 812 (2004); *Van Buren Twp v Garter Belt Inc*, 258 Mich App 594, 598; 673 NW2d 111 (2003). If future disputes arise that require the court's intervention and Rebecca believes that there are grounds to disqualify the assigned judge, she can file an appropriate motion for disqualification under MCR 2.003(B).